UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| VICKIE MADER, | CIV. NO. 18- 4066 |
| Plaintiff, | |
| vs. | COMPLAINT |
| LOWES HOME CENTERS, LLC, | JURY TRIAL DEMANDED |
| And | |
| RONALD HEIDZIG, Individually, | |
| Defendants. | |

## COMPLAINT

Plaintiff by and through her attorney, Joel Arends, brings this action for damages and other legal and equitable relief from Defendants' violations of laws proscribing sex discrimination, wrongful constructive discharge, and creating a hostile work environment in employment, and states the following as her claims against the Defendant:

### JURISIDICTION

1. Plaintiff, Vickie Mader (hereinafter "Plaintiff"), a female employee of Defendant, brings this action under Title VII of the Civil Rights Act of 1964 and under the provisions of the VII Rights Act of 1866 to redress wrongs done to her by the Defendants subjecting Plaintiff to unwelcome sexual harassment as hereinafter more specifically described, and for wrongful constructive discharge of Plaintiff, which is in violation of Title VII,§ 1981, and SDCL 20-13-10 after Plaintiff reported sexual harassment of Plaintiff by Ronald Heidzig, an employee for Defendant. Defendant Lowes Home Centers, Inc., is a business practicing in the State of South

Dakota. The Plaintiff filed a complaint of sexual harassment with the Equal Employment Opportunity Commission (hereinafter "EEOC"). Such action by Defendant constitutes discrimination on the basis of sex in the form of sexual harassment.

2.      On or about March 7, 2018, Plaintiff timely submitted a Charge of Discrimination against Defendant on the basis of sex to the EEOC. The Charge of Discrimination was filed with the Minneapolis Office of the U.S. EEOC. Plaintiff's submission to the EEOC was filed within three hundred days of the date of her constructive discharge from the employ of Defendant.

3.      On March 21, 2018, the EEOC issued a Notice of Rights, a copy which is attached hereto, marked as Exhibit A and incorporated herein by reference.

4.      Jurisdiction is conferred on this Court by Title 42 of the United States Code §2000(e)-2 and 1983, and by Title 28 of the United States Code, §1343.

5. Venue for all causes of action stated herein lies in the Southern Division of the District of South Dakota as the acts alleged as a basis for federal claims took place within the boundaries of that District.

## **PARTIES**

6.      Plaintiff was an adult female employee of Defendant at all times material hereto. Defendant is an employer within the State of South Dakota and within the jurisdictional coverage of Title VII of the Civil Rights Act.  Ronald Heidzig is a former employee of Defendant Lowes Homes Center, LLC.

7.      Plaintiff began her employment with Defendant on or about November 2009 first as a telephone operator, then progressed through various positions within the company to include a pricing coordinator, cash office employee, handling returns of merchandise, department manager of delivery and then initially left the employ of Defendant in 2015 to care for a sick family member.  Plaintiff was asked by store personnel to return to employment and accepted a

part time position that she held until May 26, 2017.

8. Plaintiff was looking forward to continuing her long-term career at Lowes.

9. On May 1, 2017, Plaintiff was working at Lowes.

10. At or around 9:30 a.m. Plaintiff was helping customers with some questions they had about a ceiling fan.

11. As Plaintiff stood talking with them, another employee, Ronald Heidzig, passed behind Plaintiff.

12. As, Heidzig passed behind Plaintiff, he reached down and grabbed Plaintiff's buttock.

13. Plaintiff turned around and looked to see if Heidzig had done it as a joke or possibly unintentionally.

14. Heidzig never turned to look back at Plaintiff and proceeded out the exit door.

15. Plaintiff was immediately angry and humiliated. Plaintiff finished up with her customers and went to her office.

16. Plaintiff was confused about why Heidzig had grabbed her buttock.

17. Plaintiff's thoughts at the time were along the line of it's going to be his word against her.

18. Plaintiff finally decided that she would talk to a female friend and co-worker, Emily Jerde, and get her thoughts on the incident.

19. Plaintiff told Jerde what had happened and immediately advised Plaintiff to address the matter with Human Resources and write a statement.

20. When Plaintiff shared with Jerde her fear of not being believed, she told Plaintiff it didn't matter and the complaint needed to get on the record.

21. Plaintiff told Jerde she would think about it overnight and make her decision the

next day. Plaintiff wanted time to calm down so she could look at the incident clearly.

22. Plaintiff decided to talk to Kellie Schelhaas, Human Resources director for the Lowes store in Sioux Falls.

23. Plaintiff proceeded to Schelhaas' office the following morning only to find Carl Oltman, the Assistant Store Manager sitting in Schelhaas' office.

24. Plaintiff asked Oltman if Schelhaas was coming in and he said no, she had called in and would not be in the office. Oltman asked if there was anything he could help Plaintiff with.

25. Plaintiff hesitated, and then decided to tell Oltman what Heidzig had done to her the day before. Oltman reacted immediately by telling Plaintiff she needed to write a statement.

26. Plaintiff was embarrassed, but proceeded to write out her complaint.

27. Oltman told Plaintiff that he would have Jerde check the video to see if it had been captured on film.

28. Plaintiff asked Oltman to let her know what Jerde saw on the video. Oltman came to Plaintiff's office later that morning and told her "we got him." Oltman said it was on video and he was very excited telling Plaintiff he had to come see it.

29. Plaintiff followed Oltman into Jerde's office and he then instructed Jerde to show Plaintiff the video. Plaintiff was amazed to see Heidzig's hand reaching down in a claw like position. Plaintiff could not watch the video anymore.

30. Plaintiff left and went back to her own office and tried to calm down and stop shaking.

31. Oltman came into Plaintiff's office and Plaintiff asked him what was going to happen next. Oltman said he would call Heidzig in for a sit down and ask him about the incident.

32. Plaintiff asked Oltman what if he says he didn't do it? Oltman assured me that he

intended on telling Heidzig that it was all caught on video and he could not deny it. Plaintiff walked away from the conversation thinking that Heidzig would be fired immediately or reassigned to another shift.

33. Plaintiff went to the Store Manager, Mr. Joseph Adams office on May 8 with the intention of asking him what was going on. Plaintiff found out Adams had gone on vacation for a week.

34. Plaintiff had been dealing with Heidzig every day since the incident happened to her and it was very uncomfortable for Plaintiff.

35. Heidzig seemed to be going out of his way to run into Plaintiff and then just stare at her.

36. Plaintiff went to Oltman and asked him if he had spoke to Heidzig. Oltman said he did and that Heidzig had denied touching Plaintiff. Oltman also said that he told Heidzig the incident was captured on video but Heidzig continued to deny it.

37. Plaintiff went to Human Resources and spoke to Schelhaas. Plaintiff told Schelhaas that she was uncomfortable with the whole situation and wondered how long it was going to take for someone to do something.

38. Schelhaas got immediately angry and told Plaintiff that she was waiting to hear back from her boss, Kristie (Last Name unknown) who is the Regional Human Resources officer for Lowes and is based in Omaha.

39. Plaintiff explained to Schelhaas that she was feeling intimidated by Heidzig.

40. Schelhaas offered to have someone walk Plaintiff to her car at the end of her shift. Plaintiff explained to Schelhaas that she was concerned about having to be in the store with Heidzig.

41. Schelhaas offered to change Plaintiff hours so she would be working when

Heidzig was not. This upset Plaintiff as she did not do anything wrong but felt like she was being punished. Plaintiff told Schelhaas that Heidzig's hours should be changed. Schelhaas that she would have to talk to Leon Garbers about changing Heidzig's hours.

42. Garbers is an Assistant Store Manager who was in charge of Heidzig's department.

43. Schelhaas proceeded to tell Plaintiff that she could not guarantee that Plaintiff would never find herself in the store the same time as Heidzig. Plaintiff left that meeting feeling like Schelhaas was not too sympathetic to her position.

44. Later that day Plaintiff spoke again to Oltman and told him how angry she was that nobody seemed to see the urgency in her situation. Oltman told me that he had shown the video to Adams and to Schelhaas but that Schelhaas was not convinced.

45. Schelhaas said that Heidzig may have been putting his hand out in case Plaintiff backed up into him. Oltman said he explained to Schelhaas that nobody puts their hand out in a claw like way and especially not down by someone's buttocks, instead they put their hand out flat up by someone's back.

46. When Plaintiff finally had the opportunity to speak to Adams, she asked if anyone had heard from Schelhaas as to what was going to be done about Heidzig. Adams picked up an envelope from his desk and said yes, I have it right here.

47. Adams said he could not tell Plaintiff what they he was going to do but it has been addressed. Plaintiff said she saw Heidzig working and she was going to assume that he did not get fired or reassigned to another shift.

48. Adams confirmed that assumption and followed it up with he was going to write up Heidgiz.

49. Plaintiff told Adams that was completely unacceptable.

50. Adams said that he would take another look at things and speak again with Schelhaas. Adams assured Plaintiff he would let her know what happened.

51. As Heidzig's employment continued it became more difficult for Plaintiff to go to work.

52. Plaintiff dreaded having to see Heidzig and had resorted to having other associates in the store walk with her whenever she had to be out on the floor doing her job. Plaintiff was constantly looking over her shoulder and felt creeped out.

53. On May 25, 2017, Plaintiff received an email from Schelhaas asking Plaintiff to visit with her or Adams the next morning.

54. On or about May 26, 2017, Plaintiff called the employee relations line, an 800 number that allows employees to report whatever they have a concern over. Plaintiff left a recording requiring her to leave her personal information and the reason for the call.

55. On May 26, 2017, Plaintiff went to speak with Adams and he was not in.

56. Plaintiff proceeded to speak with Schelhaas and was then informed that the decision had been made to write up Heidzig.

57. Plaintiff told Schelhaas that the arrangement was not going to work for her.

58. Schelhaas assured Plaintiff that the decision was not made by her personally as the decisions had come from Kristie in the Omaha office.

59. Plaintiff told Schelhaas that she did not go around making accusations about somebody for no reason.

60. Schelhaas told Plaintiff the decision was final.

61. Plaintiff resigned as a result of constructive discharge on May 26, 2017, after being informed of the decision by Schelhaas.

62. Adams and Schelhaas told Plaintiff that they did not want her to quit.

63. Plaintiff told Adams and Schelhaas they had left her no alternative and that she could not continue to work the same shift as Heidzig.

64. On May 30 Plaintiff received a call from Kyle French. French explained he was the Human Resources Director over all the stores at Lowes.

65. French wanted Plaintiff to tell him what had happened.

66. Plaintiff went through the entire series of events and French asked Plaintiff if she would be interested in taking her job back if French could resolve this issue to her satisfaction.

67. Plaintiff told French that she loved her job and was upset that she was forced to give it up.

68. French asked Plaintiff to give him a couple of days to look into it.

69. French assured Plaintiff he had opened an investigation and that he would get back to her.

70. On June 5, Plaintiff called the number French gave her and left a voicemail asking for an update.

71. French called Plaintiff back on June 23 and said that he would have Schelhaas call Plaintiff and explain what was going on.

72. On June 30 Plaintiff received a call from Schelhaas where she explained that she thought that Plaintiff was willing to come back to work.

73. Plaintiff reasserted to Schelhaas that she was not sure this was going to work given that Heidzig was still working in the store during Plaintiff's shift.

74. Schelhaas asked Plaintiff to take the long weekend to think about it and she would call Plaintiff after the 4th of July weekend.

75. Plaintiff told Schelhaas that her decision had been made and she that she could not go back to work when Heidzig was working on the same shift.

76. Schelhaas assured Plaintiff that Heidzig was going to be fired over the weekend, but that she was not supposed to tell Plaintiff that.

77. Plaintiff later learned that Heidzig had been fired, but it was because of attendance, not because of what he had done to Plaintiff.

78. Plaintiff has had a difficult time coming to terms with what happened to her.

79. Plaintiff does not think Lowe's treated her fairly.

80. Not one time did anyone show any compassion or concern for Plaintiff's wellbeing as they wanted her to change her shift hours and would not change Heidzig's shift hours.

81. Plaintiff has struggled with the fact that Heidzig got away with touching her and she lost her job for it.

82. Plaintiff has been unable to even look for another position, as it is difficult for her to think about what she is supposed to tell any future employer about why she left Lowe's.

83. Plaintiff did not encourage Heidzig's behavior and she also did not want Heidzig's behavior to interfere with her work.

84. Plaintiff found Heidzig's behavior to be offensive, repulsive and unwelcome.

85. Heidzig's behavior also interfered with Plaintiff's ability to work.

86. Heidzig created a hostile work environment for the Plaintiff by continuing to act in a manner that was sexually inappropriate, unwanted and unwelcome.

87. Plaintiff believes Lowe's constructively discharged her because store personnel did not take adequate measures to keep Heidzig separated from Plaintiff during her shift.

## COUNT I

### DISCRIMINATION PURSUANT TO 42 U.S.C. §2000E-2

Plaintiff incorporates all paragraphs of this Complaint as if fully set forth under this

county and alleges that:

88. Plaintiff and Defendant herein named are employee and employer, respectively, for the purposes of the definitions set forth in U.S.C. § 2000e-2, et seq.

89. 42 U.S.C. 2000e-2(a)(1) provides that is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individuals...sex..."

90. Heidzig's conduct towards Plaintiff as herein alleged was unwelcome, and such conduct substantially interfered with Plaintiff's employment and created an intimidating, hostile and offensive work environment for Plaintiff. This conduct was sexual harassment in direct violation of U.S.C. § 2000e-2, et seq. Defendant knew or should have known the existence of the harassment and failed to take timely appropriate action.

91. The unlawful employment practices complained of above were intentional, and have been done with malice or reckless indifference to the federally protected rights of Plaintiff.

92. Defendant's discriminatory working conditions, its failure to promptly investigate and handle Plaintiff's sexual harassment complaint against Heidzig, Defendant's failure to assure Plaintiff that Defendant would not tolerate any reprisal taken against Plaintiff by Heidzig and the failure to separate Heidzig from Plaintiff created an intolerable work environment for Plaintiff.

93. As a result of Defendant's violations of U.S.C. §2000e-2, *et seq.*, Plaintiff has suffered past and present loss of income, medical expenses, mental anguish, humiliation, embarrassment, loss of reputation, and other pain and suffering. Defendant is further subject to such damages as permitted by law including punitive damages as determined by the trier of fact.

94. As a result thereof, Plaintiff is entitled to her damages in an amount to be determined at trial, in addition to her costs, disbursements, and attorney fees incurred herein.

## COUNT TWO

## **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

Plaintiff incorporates all paragraphs of this Complaint as if fully set forth under this count and further alleges that:

95. Defendant had a duty to refrain from the humiliating, abusive, and degrading behavior towards Plaintiff. Defendant violated that duty by the actions of Heidzig, in making sexually assaultive behavior towards Plaintiff.

96. Defendant knew or should have known that emotional distress was certain or substantially certain to result from Hiedzig's misconduct towards Plaintiff.

97. The actions of Heidzig alleged herein constitutes outrageous conduct beyond the bounds of decency and intolerable in a civilized society.

98. The extreme and outrageous nature of the conduct arises from the abuse by Defendant's agent, Defendant's relationship and position, which gave actual or apparent power to damage Plaintiff's interest.

99. As a direct and proximate result of Defendant's outrageous conduct Plaintiff has suffered and continues to suffer mental anguish, pain and suffering, humiliation embarrassment, emotion distress and other damages in an amount to be determined at trial, but which exceeds Seventy-five Thousand and 00/100 dollars ($75,000.).

## COUNT THREE

## **VICARIOUS LIABILITY**

Plaintiff incorporates all paragraphs of this Complaint as if fully set forth under this count and further alleges that:

100. At all times material hereto, Heidzig was an agent of Defendant. The wrongful actions of Heidzig and Defendant's other agents and employees as described herein were at all

times related to their duties and responsibilities as agents of Defendant and/or accomplished by virtue of the authority granted to them by Defendant and therefore, Defendant is liable for the wrongful conduct of Heidzig and of Defendant's other agents and employees under the law of vicarious liability.

## COUNT FOUR

### RESERVE PUNITIVE DAMAGES

Plaintiff incorporates all paragraphs of this Complaint as if fully set forth under this count and further alleges that:

101.    Based on the foregoing allegations, Defendant's conduct showed a disregard for Plaintiff's rights because they acted willfully or wantonly to the injury of Plaintiff and Defendant is therefore liable to Plaintiff for punitive damages.

## COUNT FIVE

### BREACH OF CONTRACT

Plaintiff incorporates all paragraphs of this Complaint as if fully set forth under this count and further alleges that:

102.    If the Defendant maintained an employee policy handbook the Defendant's Policy and Procedure Manual may have constituted a contract between the Plaintiff and Defendant in which Defendant may have promised to "promptly" handle and investigate all allegations of sexual harassment.

103.    Defendant may have breached its contract with Plaintiff by failing to "promptly" handle and investigate all allegations of sexual harassment.

104.    As a consequence of Defendant's potential breach of such a contract with Plaintiff, Plaintiff was constructively discharged from her employment with the Defendant, resulting in lost earnings to Plaintiff in an amount to be determined by trial.

## DEMAND FOR JURY TRIAL

105. Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby requests trial by jury of the issues of fact in this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

A. For compensatory damages arising from the past, present and future loss of income, including loss of benefits, loss of career development, loss of future earning capacity, humiliation, embarrassment, loss of reputation, emotional distress, and pain and suffering in an amount to be determined at trial;

B. For punitive damages for the willful and wanton injury to Plaintiff as a result of Defendant's conduct toward Plaintiff in an amount to be determined at trial;

C. For an order of the Court awarding Plaintiff her back pay, front pay, attorney fees, costs, and disbursements incurred herein as allowed by law; and

D. For such other and further relief as the Court deems just and proper.

Dated this 14th day of June, 2018.

ARENDS LAW, P.C.

Joel A. Arends
Arends Law, P.C.
P.O. Box 1246
Sioux Falls, SD 57101-1246
joel@arendslaw.com
Attorney for Plaintiff