UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| VICKIE MADER,<br><br>Plaintiff,<br>vs.<br><br>LOWE'S HOME CENTERS, LLC,<br><br>and<br><br>RONALD HEIDZIG, Individually,<br><br>Defendants. | 18-4066<br><br>MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING AND PART MOTION FOR SUMMARY JUDGMENT |

On June 14, 2018, Plaintiff, Vickie Mader ("Mader") filed a Complaint against Defendants Lowes Home Centers, LLC, ("Lowe's") and Ronald Heidzig ("Heidzig"). Doc. 1. In her Complaint, Mader alleges a claim for sexual harassment/hostile work environment in violation of 42 U.S.C. § 2000e-2(a)(1), intentional infliction of emotional distress, vicarious liability, punitive damages, and breach of contract. Doc. 1.

On April 1, 2018, Lowe's filed a Motion for Summary Judgment on all of Mader's claims. Doc. 17. On August 6, 2019, the Court issued an order setting oral argument on the pending summary judgment motion for August 8, 2019. Doc. 35. The Court indicated in its order that it wanted to hear argument on whether the alleged conduct was severe and pervasive as to affect a term, condition, or privilege of Mader's employment and whether or not Lowe's took prompt remedial action reasonably calculated to stop the harassment. Doc. 35. At oral argument, both Mader and Lowe's were represented by counsel. Heidzig has not yet entered an appearance in this matter.

For the following reasons, this Court grants in part and denies in part Lowe's' motion for summary judgment.

**BACKGROUND**

1

In May 2017, Plaintiff, Vickie Mader ("Mader"), was a part-time employee working at the Sioux Falls Lowes's store and was an at-will employee. Doc. 19, ¶ 1; Doc. 24, ¶ 1. On May 2, 2017, Mader reported to Lowe's Assistant Store Manager Oltman that the prior day, while she was speaking with customers about a ceiling fan, Heidzig squeezed her left butt cheek as he was passing by. Doc. 19, ¶ 2; Doc. 24, ¶ 2; Mader Dep. 67:15-68:9. No words were exchanged during this alleged incident and Mader and Heidzig never spoke about the incident thereafter. Doc. 19, ¶ 2; Doc. 24, ¶2; Mader Dep. 69:11-21. Heidzig was a co-worker of Mader's and had never served in a management or supervisory position for Lowe's. Doc. 29, ¶ 2. Although Mader testified that her male co-workers often "act[ed] like sophomores in school . . . [t]elling dirty jokes, [ ] stuff like that," this incident was unusual and nothing like it had happened to Mader during her prior thirteen years of employment with Lowe's. Mader Dep: 32:12-23; Doc. 19, ¶ 2; Doc. 24, ¶ 2.

Lowe's has an Employee Handbook which contains the company's No Harassment Policy. Doc. 21, ¶ 9. The No Harassment Policy provides that:

> The purpose of the No Harassment policy is to outline the Company's commitment to building and preserving a community in which all of its members can work together, free of discrimination and harassment of any kind.
>
> . . .
>
> All reports [of discrimination or harassment] will be investigated promptly and thoroughly by [Lowe's]. . . .

Doc. 21-1. The Employee Handbook has no required pre-termination procedure for employees and does not have exclusive list of termination reasons. Doc. 21, ¶ 9. In the Employee Handbook is language providing that the Handbook is not to be considered a contract. Doc. 21, ¶ 9.

On May 2, 2017, the day that Mader reported to Oltman that Heidzig grabbed her butt, they reviewed video footage of the incident. Mader Dep. 73:18-76:9. While reviewing the video footage, Mader saw Heidzig's hand out in a "claw-like" position, reaching toward her and Oltman responded that "we got him" and "this is a slam dunk." Mader Dep. 75:1-24; 76:3-4. Eventually, Mader was informed by Oltman that Lowe's had spoken to Heidzig, that he denied the incident, and that Human Resources ("HR") had viewed the video and had not come to the conclusion that it clearly showed Heidzig grabbing Mader's butt. Mader Dep. 79:19-80:3.

After reporting the incident, Mader continued to work, was able to perform her job duties, and was not required to work with or in the same department of Heidzig. Doc. 19, ¶ 4; Doc. 24, ¶ 4. Mader had a dedicated office with an office door that she could close. Mader Dep. 35:6-16. Until Mader resigned on May 26, 2017, she saw Heidzig approximately 20 times, but the two never spoke to each other. Doc. 19, ¶ 4; Doc. 24, ¶ 4; Mader Dep. 41:1-25. Most of those occasions involved Mader seeing Heidzig somewhere in the store, but on five of six of those occasions, Mader opened her office door, which was located by an exit door, and found Heidzig standing there, staring at her. Mader Dep. 48:24-49:25. On one occasion, Heidzig "barged" into Mader's office, "hit the door, and it flew open and hit the wall." Mader Dep. 48:15-16. Mader's male coworker was in her office and he "jumped up and put his hand on [Heidzig's] chest and backed him right out of the office, pulling the door shut behind him." Mader Dep. 48:16-19.

Mader testified that she felt intimidated by Heidzig's conduct. Mader Dep. 50:2-4. Mader's co-worker would sometimes open her office door to see if Heidzig was there before she exited. Mader Dep. 50:11-14. Although Mader's counsel states in his statement of material facts that Mader needed the assistance of other employees to walk her around the store because of her concerns about Mr. Heidzig having contact with her, Doc. 24, ¶ 4, the Court has not been able to find evidence supporting this assertion in the record before it.

At some point during the month, Mader had also called the Lowe's compliance line because she had not received any information about what, if anything, was being done to address her initial complaint. Mader Dep. 89:19-90:6. Mader twice left her name and store number and asked that someone return her call, but nobody called her back. Mader Dep. 89:19-90:6.

On or around May 19, 2017, approximately two and one-half weeks after the incident, Mader still had not yet heard from Lowe's on how they would be addressing her initial complaint. At that time, Mader approached HR to inquire about what action Lowe's would be taking in response to the alleged incident. Mader Dep. 81:8-21; 84:9-24. Mader told HR that she wanted to know what was going to be done because she "still had to deal with this guy." Mader Dep. 81:18-21. Mader testified that she felt intimidated and told HR that Heidzig had been standing outside her office, staring at her when she exited on more than one occasion. Doc. 24, ¶ 4; Mader Dep. 50:2-4; 83:15-24. The Court finds that there is no evidence in the record showing that Lowe's was also made aware of the incident in which Heidzig barged into Mader's office. Mader testified

that HR told her that because her office was by an exit door, Heidzig may have been coming or going, and offered to have someone escort Mader to her car. Mader Dep. 81:22-82:8; 83:15-17. Mader responded that she was not concerned about walking to her car, but about having to be in the store with Heidzig. Mader Dep. 82:5-10. HR stated that if he was being an issue, they could change Mader's hours so she would not be in the store at the same time as him. Mader Dep. 49:19-22; 81:18-23. When Mader responded that she felt like it was not fair to change her hours and that they should consider changing Heidzig's hours, HR responded that they would have to talk to the manager of Heidzig's department about changing Heidzig's hours, and that Lowe's "may be able to arrange that." Mader Dep. 81:18-82:4.

At that time, Mader was told that they were waiting for an update from corporate in Omaha as to how they were going to address the alleged butt-grabbing incident. Mader Dep. 82:16-19. Additionally, management expressed that what happened to Mader was less important than some of the personal issues the manager had been dealing with in her own life. Mader Dep. 82:16-19.

Sometime on or around May 23, 2017, Mader spoke with management and was informed that Lowe's had concluded its investigation and that Heidzig had received a written reprimand. Doc. 19, ¶ 5; Doc. 24, ¶ 5; Mader Dep. 85:11-86:3. Lowe's also required Heidzig to undergo counseling on sexual harassment and notified him that any further conduct would result in termination, although it appears from the record that Mader was not aware that these other disciplinary measures had been taken. Doc. 19, ¶ 5; Doc. 24, ¶ 5; Mader Dep. 96:17-25. As part of its investigation, in addition to speaking with Mader and reviewing the video footage, Lowe's also reviewed Heidzig's performance. Doc. 19, ¶ 3; Doc. 24, ¶ 3. Prior to this May 1, 2017, incident, Heidzig generally had a good performance history, had a good pre-employment background, and no reports of inappropriate conduct by Heidzig had been made. Doc. 19, ¶ 3; Doc. 24, ¶ 3; Doc. 20, ¶ 4(c).

After hearing that Heidzig had received a written reprimand, Mader asked her manager to revisit their decision. Mader Dep. 86:2-22. On May 26, 2017, Mader was informed that Lowe's would not be altering its remedial action plan. Mader. Dep. 88:17-21. That day, Mader tendered her letter of resignation. Mader Dep. 89:8-11. Mader again expressed to concern about having to continue working with Mader, and Lowe's did not again reiterate their week-old offer to look into

4

changing Heidzig's hours and said that the corporate office had made its decision and there was nothing they could do. Mader Dep. 92:14-22.

Lowe's later fired Heidzig, and during that process asked Mader to return to work, but Mader decided not to return. Doc. 19, ¶ 7; Doc. 24, ¶ 7.

On June 14, 2018, Mader filed a Complaint against Lowe's and Heidzig. Doc. 1. In her Complaint, Mader alleges claims for hostile work environment in violation of 42 U.S.C. § 2000e-2(a)(1), intentional infliction of emotional distress, vicarious liability, punitive damages, and breach of contract. Doc. 1.

On April 2, 2019, Lowe's filed a Motion for Summary Judgment, and in its Motion, asks the Court to grant summary judgment in its favor and dismiss each of Mader's claims. The Motion for Summary Judgment has been fully briefed by the parties and the Court heard oral argument on the motion on August 8, 2019. For the following reasons, the Court grants summary judgment in favor of Lowe's on Mader's claims alleging intentional infliction of emotion distress, vicarious liability, and breach of contract and denies summary judgment on Mader's hostile work environment claim.

## STANDARD OF REVIEW

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate where "there is no dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant 'bears the initial responsibility of informing the . . . district court of the basis for its motion,' and must identify 'those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2001) (en banc) (quoting *Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986)). Once the motion for summary judgment is made and supported, it places an affirmative burden on the non-moving party to go beyond the pleadings and cite to particular parts of materials in the record, showing that there is a genuine issue for trial. *See Commercial Union Ins. Co. v. Schmidt*, 967 F.2d 270, 271 (8th Cir. 1992); Fed. R. Civ. P. 56(c). The nonmovant must do more than "assert[] 'the mere existence of some alleged factual dispute between the parties'; the [nonmovant] must assert that there is a 'genuine issue of material fact'"

5

*Quinn v. St. Louis Cnty.*, 653 F.3d 745, 751 (8th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) (emphasis omitted)).

## DISCUSSION

Lowe's has moved for summary judgment on Mader's claims alleging: sexual harassment and hostile work environment in violation of 42 U.S.C. § 2000e-2(a)(1), intentional infliction of emotional distress, vicarious liability, and breach of contract.

### I.    Sexual Harassment/Hostile Work Environment Claim

Under Title VII of the Civil Rights Act of 1964, an "employer" is prohibited from discriminating against "any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "Sexual discrimination that creates a hostile or abusive work environment is a violation of Title VII." *Hall v. Gus Constr. Co.*, 842 F.2d 1010, 1013 (8th Cir. 1988). "A hostile work environment 'arises when sexual conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.'" *Vajdl v. Mesabi Academy of KidsPeace, Inc.*, 484 F.3d 546, 550 (8th Cir. 2007) (quoting *Hall*, 842 F.2d at 1013). To establish a prima facie hostile work environment claim, a plaintiff must show: 1) that she belonged to a protected group; 2) that she was subjected to unwelcome harassment; 3) that the harassment was based on sex; 4) that it affected a term, condition, or privilege of employment; and 5) that the employer knew or should have known of the harassment and failed to take prompt and effective remedial action. *Alagna v. Smithville R-II Sch. Dist.*, 324 F.3d 975, 979 (8th Cir. 2003).

The parties do not dispute that Mader is a member of protected group or that a juror could reasonably infer that she was subject to unwelcome harassment. The parties disagree whether the allegedly hostile acts directed at Mader were because of her gender and whether they were severe and pervasive so as to alter the terms and conditions of her employment. Additionally, the parties dispute whether Lowe's failed to take prompt and effective remedial action reasonably calculated to stop the harassment.

### A. On the Basis of Sex and Severe and Pervasive

6

In order to establish a prima facie hostile work environment claim, Plaintiff must establish a reasonable juror could infer that the alleged harassment was based on sex and was so severe or pervasive as to alter a term, condition, or privilege of employment. *Id.* In determining whether conduct is sufficiently severe or pervasive, a court must look to the totality of the circumstances. *Duncan v. Gen. Motors Corp.*, 300 F.3d 928, 934 (8th Cir. 2002). "The whole pattern of conduct must be examined, for its severity and pervasiveness cannot be fully understood by "carving it 'into a series of discrete incidents.'" *Sheriff v. Midwest Health Partners, P.C.*, 619 F.3d 923, 930 (8th Cir. 2010) (quoting *Hathaway v. Runyon*, 132 F.3d 1214, 1222 (8th Cir. 1999) (citation omitted)).

### i. *Isolated incidence?*

Lowe's contends that the incidents alleged by Mader in her Complaint cannot, as a matter of law, constitute harassment so severe and pervasive as to alter a term, condition, or privilege of Mader's employment. Lowe's characterizes the conduct alleged by Mader in her Complaint as an isolated incidence (a butt grab) and argues that no reasonable juror could infer that the other incidents (standing and staring outside her office), constituted harassment on the basis of Mader's sex.

It is true, that, as argued by Defendant, an isolated incidence of a butt grab, without more, would not be so severe as to alter the terms and conditions of Plaintiff's employment. However, the conduct that Mader experienced did not stop here. Mader also alleges that over the next few weeks, on approximately five to six different occasions, she opened her office door to find Heidzig standing approximately five feet away by the exit door, staring at her. In addition, Mader testified to one instance in which Heidzig "barged" into her office, "hit the door, and it flew open and hit the wall" and the male employee in her office "jumped up and put his hand on [Heidzig's] chest and backed him right back out of the office, pulling the door shut behind him."

Whether harassing conduct is based on sex is determined by inquiring "whether 'members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.'" *Quick v. Donaldson Co.*, 90 F.3d 1372, 1378 (8th Cir. 1996) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 25 (1993) (Ginsburg, J., concurring)). While Heidzig's conduct toward Mader subsequent to the butt-grabbing incident is not explicitly sexual in nature, it is well-settled that "[n]ot every aspect of a work environment characterized by hostility

7

and intimidation need be explicitly sexual in nature to be probative." *Hathaway*, 132 F.3d at 1222. "All instances of harassment need not be stamped with signs of overt discrimination to be relevant under Title VII if they are part of a course of conduct which is tied to evidence of discriminatory animus." *Carter v. Chrysler Corp.*, 173 F.3d 693, 701 (8th Cir. 1999).

The Court must assume for purposes of this motion that Heidzig grabbed Mader's butt on May 1, 2017; that Mader found Heidzig standing and staring at her on five to six occasions when she exited her office; and that Mader burst into her office and was forcibly removed by a male co-worker. The sexual nature of the butt-grab justifies an inference that it was sexually discriminatory. *See Sheriff*, 619 F.3d at 930. Moreover, there is no evidence in the record before the Court that Heidzig grabbed the butts of other male employees. While the conduct subsequent to the butt grab was not overtly sexual in nature, it appears from the record that such conduct did not begin until after the butt-grabbing incident. Accordingly, the Court concludes that a reasonable juror could determine that there was a connection between the butt grab and the other offending behavior that was not overtly sexual. *See Hathaway*, 132 F.3d at 1222; *Sutherland v. Mo. Dept. of Corrections*, 580 F.3d 748, 751 (8th Cir. 2009) (stating that in *Hathaway*, the jury determined there was a connection between the two physical advances and the other non-overtly sexual offending behavior)).

The question then, is whether a reasonable juror could find that the alleged harassment is so severe and pervasive as to alter the conditions of Mader's employment.

### ii. Severe and Pervasive?

The Supreme Court has identified certain factors to consider in determining whether the complained-of conduct is sufficiently severe or pervasive as to affect an employee's terms and conditions of employment. Specifically, a court should consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance," as well as physical proximity to the harasser, and the presence or absence of other people. *Hocevar v. Purdue Frederick Co.*, 223 F.3d 721, 737 (8th Cir. 2000) (citing *Harris*, 510 U.S. at 23); *Carter*, 173 F.3d at 702.

"To support a cause of action, conduct must be extreme and not merely rude or unpleasant to affect the terms and conditions of employment." *Meriwether v. Caraustar Packaging Co.*, 326 F.3d 990, 993 (8th Cir. 2003) (internal quotation and citation omitted). "Harassment need not be so extreme that it produces tangible effects on job performance or psychological well-being to be actionable," although such evidence is probative of the severity and pervasiveness of the requirement. *Carter*, 173 F.3d at 702 (citing *Harris*, 510 U.S. at 22); *see also Kopp v. Samaritan Health Sys., Inc.*, 13 F.3d 264, 269 (8th Cir. 1993) ("Psychological harm to the plaintiff is relevant, as one factor among many, but Title VII does not require concrete psychological harm."). However, a plaintiff must show that the harassment was "so intimidating, offensive, or hostile that it poisoned the work environment." *Tuggle v. Mangan*, 348 F.3d 714, 720 (8th Cir. 2003). "'[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 778 (1998) (internal citation and quotation omitted). Similarly, for sexual harassment to be sufficiently severe or pervasive to create a hostile working environment "[m]ore than a few isolated incidents are required." *Kimzey v. Wal-Mart Stores, Inc.*, 107 F.3d 568, 573 (8th Cir. 1997) (citing *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67 (1986)).

Further, the conduct allegedly creating a hostile work environment must be both objectively and subjectively offensive. *See Harris*, 510 U.S. at 21-22. Thus, Mader must present evidence that she subjectively perceived the harassment as sufficiently severe and pervasive to alter the terms or conditions of her employment, and this subjective perception must be objectively reasonable. *Id.* ("Conduct that is not severe or pervasive enough to create an objectively hostile or abusive environment—an environment that a reasonable person would find hostile or abusive— is beyond Title VII's purview.").

Here, Mader has shown that she subjectively perceived Heidzig's alleged harassment as sufficiently severe and pervasive so as to alter the terms and conditions of her employment because Heidzig's actions and Lowe's remedial actions allegedly prompted her to resign from employment with Lowe's. Additionally, Mader testified in her deposition that she was offended and intimidated by Heidzig's conduct.

The Court acknowledges that there is a high standard in this Circuit for what constitutes harassment sufficient to create an objectively hostile work environment. *See, e.g., Tuggle*, 348

Accordingly, viewing the totality of the alleged harassment in the light most favorable to Mader, the non-moving party, the Court concludes there is a jury question as to whether Heidzig's conduct was sufficiently severe and pervasive to alter the terms and conditions of Mader's employment.

### iii. Remedial Action Taken by the Employer

"Once an employee complains to her employer about sexual harassment by a coworker, the employer is on notice and must take proper remedial action to avoid liability under Title VII." *Hathaway*, 132 F.3d at 1223 (8th Cir. 1997). "In addition to conducting an investigation, the employer must take 'prompt remedial action reasonably calculated to end the harassment.'" *Id.* at 1224 (quoting *Davis v. Tri-State Mack Distrib., Inc.*, 981 F.2d 340, 343 (8th Cir. 1992)).

If a plaintiff makes a submissible case that management knew or should have known of the harassment and failed to put a stop to it promptly, the promptness and adequacy of an employer's response will often be a question of fact for the fact-finder to resolve. *See Howard v. Burns Bros., Inc.*, 149 F.3d 835, 841 (8th Cir. 1998) (citing *Smith v. St. Louis Univ.*, 109 F.3d 1261, 1265 (8th Cir. 1997)). An employer is not necessarily obligated to terminate an employee who engaged in sexual harassment. *See Bailey v. Runyon*, 167 F.3d 466, 468 (8th Cir. 1999). Rather, what an employer must do is take prompt remedial action reasonably calculated to stop the harassment. *Carter*, 173 F.3d at 702 (citations omitted). Factors to assess the reasonableness of remedial measures may include: (1) the amount of time that elapsed between the notice and remedial action; (2) the options available to the employer, possibly including employee training sessions, transferring the harassers, written warnings, reprimands in personal files, or termination; and (3) whether or not the measure ended the harassment. *Id.* (citations omitted).

Once Lowe's was informed of the butt-grabbing incident, it began conducting an investigation which involved speaking to both Mader and Heidzig, reviewing the video footage, as well as Heidzig's performance history. There is no dispute that after this initial incident, Mader not subjected to further sexual touching or other overtly sexual behavior by Heidzig. However, as the Court stated previously, the discriminatory conduct by Heidzig continued, and although it was less overtly sexual in nature, in the Court's view, Heidzig's conduct had become more threatening. A reasonable inference could be made that over the next couple of weeks, Heidzig was going out of his way to hang outside Mader's office and stare at her when she exited and, as the Court has

already discussed at length, the threatening nature of Hedizig's continued to escalate when he barged into Mader's office and had to be forcibly removed.

It was not until approximately two and one-half weeks after the initial butt-grabbing incident that Mader made management aware that Heidzig was continuing to harass her. Mader had not yet heard from management about what they were doing to address her initial complaint and Mader made clear to management that she was "still having to deal with this guy," that she would find him standing outside her office staring at her, that she did not know why he was doing this, and that she was intimidated. Given Mader's initial complaint that Heidzig had grabbed her butt and the video footage of the incident, the Court concludes that Lowe's was obligated to at least investigate Mader's complaints of further harassing conduct by Heidzig. *Hathaway*, 132 F.3d at 1224 ("In addition to conducting an investigation, the employer must take prompt remedial action reasonably calculated to end the harassment.) Lowe's made no such efforts. In fact, management dismissed Mader's concerns, stating that Heidzig may have been coming or going and that what happened to Mader was less important than some of the personal issues the manager had been dealing with in her own life. Although management did not feel it was necessary to investigate Mader's complaints further, management did feel that it was appropriate to offer to have someone walk Mader to her vehicle.

Shortly thereafter, on or around May 22, 2017, the corporate office completed its investigation into the butt-grabbing incident. Lowe's issued Heidzig a written reprimand, required him to undergo sexual harassment training, and told him that further such conduct would result in his termination. Had the one-time butt grab been the only conduct that Mader complained of, the Court concludes that this the action taken by Lowe's would have been prompt and reasonably calculated to stop the harassment.

However, that is not the only conduct that Mader had complained of. The Court concludes that a reasonable juror may conclude that Lowe's proposed remedial action was not reasonably calculated to end the harassment complained of given it did not address the more threatening conduct that Mader complained of at least several days prior. A reasonable inference can be made from the facts in the record that Lowe's had no intention of investigating these additional instances of harassment or would consider these new complaints by Mader in reconsidering its remedial action plan. Although Lowe's had informed Mader that they may be willing to rearrange Heidzig's

F.3d at 721-22. However, "[e]ach case must stand on its own circumstances." *Eich v. Bd. of Regents for Cent. Mo. States Univ.*, 350 F.3d 752, 760 (8th Cir. 2003). Compared to many of the other Eighth Circuit cases examining the severity and pervasiveness of a defendant's conduct, the conduct that forms the basis of Mader's complaint took place over a relatively short period of time, less than one month[1], although the alleged acts occurred approximately seven times during that short time.[2] Additionally, although Mader was not required to work in close proximity to Heidzig and was able to largely perform her job duties, as stated above, "harassment need not be so extreme that it produces tangible effects on job performance." *Tuggle*, 348 F.3d at 720. And, as the record shows, Heidzig was able to continue his discriminatory conduct despite the fact that the parties were not required to work in close proximity to each other. The Court finds that in the aggregate, Heidzig's conduct that was not simply "boorish, chauvinistic, [or] [] immature," *Duncan*, 300 F.3d at 935 (8th Cir. 2002), nor was it a "merely rude or unpleasant," *Cross v. Prairie Meadows Racetrack & Casino, Inc.*, 615 F.3d 977, 981 (8th Cir. 2010). Rather, the Court finds that a reasonable person in Mader's position would find Heidzig's discriminatory conduct to be physically threatening and intimidating conduct taken toward Mader on the basis of her sex. The conduct allegedly began with the humiliating act of grabbing of Mader's butt in front of customers and a reasonable inference can be made that Heidzig went out of his way to continue engaging in intimidating and harassing behavior by standing outside Mader's office and staring at her when she exited. Mader put up with the dirty jokes and sophomoric behavior exhibited by many of her male co-workers in the past. However, the incident where Heidzig barged into Mader's office not only appeared threatening to Mader, but also to her male co-worker whose response was to forcibly remove Heidzig from the office. Heidzig's conduct is was a good deal more than boorish or sophomoric.

---

[1] *Sheriff*, 619 F.3d at 930 (concluding that repeated unwelcome and offensive physical contact for approximately two years despite complaints to management was severe and pervasive); *Cross v. Prairie Meadows Racetrack & Casino, Inc.*, 615 F.3d 977, 981 (8th Cir. 2010) (four incidents over two years did not rise to the level of harassment); *Eich*, 350 F.3d at 760 (sexual touching and innuendos continuing over a 7 year period was sufficiently severe or pervasive); *Carter*, 173 F.3d at 702 (finding evidence that plaintiff experienced a "host of indignities" over the course of some two years); *Howard v. Burns Bros.*, 149 F.3d 835, 843 (8th Cir. 1998) (defendant's pattern of sexual innuendo and other inappropriate conduct was chronic and continued over years).

[2] After the initial butt-grabbing incident, Mader testified that she saw Heidzig standing outside her office five to six times and that he forcefully barged into her office on a separate occasion.

hours, a reasonable juror find that its offer rang hollow. After Mader tended her resignation and reiterated that she was concerned about having to continue working with Heidzig, Lowe's never mentioned that it would continue to explore its week-old offer to rearrange Heidzig's hours. Instead, management in the Sioux Falls office made it clear that corporate had made its decision and there was nothing further they could do.

In viewing the facts most favorably to Mader and making all reasonable inferences in her favor, this Court cannot conclude as a matter of law that Lowe's took prompt and effective remedial action reasonably calculated to stop the harassment that Mader complained of. Lowe's motion for summary judgment on Mader's claim for hostile work environment is denied.

## I. Breach of Contract Claim

Under South Dakota law, the elements of a breach of contract action are: 1) an enforceable promise, 2) a breach of the promise, and 3) resulting damages. *Guthmiller v. Deloitte & Touche, LLP*, 699 N.W.2d 493, 498 (S.D. 2005).[3]

Mader alleges that Lowes's Employee Handbook which contained Lowes's No Harassment Policy constituted a contract of employment between Mader and Lowes. The No Harassment Policy provides that "[a]ll reports [of discrimination or harassment] will be investigated promptly and thoroughly by [Lowe's]." Doc. 21-1. Mader contends that Lowe's breached its employment contract by failing to "promptly" handle and investigate all of Mader's allegations of sexual harassment in accordance with the provisions of the No Harassment Policy. Compl. ¶¶ 102-04. Mader alleges that as a result of such breach, she was constructively discharged from her employment with Lowe's, resulting in lost earnings to Mader. Compl. ¶¶ 102-04.

This Court addressed a similar argument in *Jaros v. Lodgnet Entertainment Corp.*, No. 00-4007, Docket 38 (D.S.D. Apr. 26, 2001) (J. Piersol). There, the plaintiff argued, as Mader does in this case, that the employer violated its sexual harassment policy by failing to "promptly" investigate the plaintiff's complaints of sexual harassment. *Id.* at 7. The Court noted that the

---

[3] A federal court exercising supplemental jurisdiction over claims arising under state law applies the substantive law governing the claims, which in this case, is South Dakota law. *See Rau v. Roberts*, 640 F.3d 324, 327-28 (8th Cir. 2011) (citation omitted).

South Dakota Supreme Court had not specifically resolved whether, and in what circumstances, complaint procedures in an employee handbook become contractually binding. *Id.*

In determining how the South Dakota Supreme Court would resolve the issue, the Court found instructive cases examining whether an employee manual may explicitly or implicitly contractually alter an employee's at-will status. In these cases, the South Dakota Supreme Court stated that the language of the employee manual must clearly indicate intent to create a binding contract—either by expressly limiting discharge to cause, or by implication, by creating a detailed list of exclusive grounds for discharge *and* "a mandatory and specific procedure which the employer agrees to follow prior to any employee's termination." *Petersen v. Sioux Valley Hosp. Ass'n*, 486 N.W.2d 516, 520 (S.D. 1992) (quoting *Butterfield v. Citibank of S.D.*, 437 N.W.2d 857, 859 (S.D. 1989)).

Applying the logic of the South Dakota cases to *Jaros* case, this Court concluded that the employee handbook, which contained LodgeNet's sexual harassment policy, did not evince a clear intent to create new contractual rights, but rather contained general statements of adherence to the anti-discrimination laws. *Id.*; *see also Petersen*, 486 N.W.2d at 520. To the contrary, the Court noted that the employee handbook expressly stated that it did not create any contractual rights. *Id.* The Court held that under those circumstances, LodgeNet's sexual harassment policy did not constitute an "enforceable promise" and accordingly granted LodgeNet's motion for summary judgment on this claim. *Id.*; *see also Houck v. ESA, Inc.*, No. Civ. 12-4197, 2014 WL 2615773, at *12 (D.S.D. 2014) (citing *Johnson v. Gateway, Inc.*, No. 04-4186, 2007 WL 1231657, at *15 (D.S.D. Apr. 24, 2007) ("The fact that a company puts a harassment policy in place does not act as a waiver or relinquishment of its status as an at-will employer.")); *Poulos v. Summit Hotel Properties, LLC*, No. 09-4062, 2010 WL 3604127, at *7 (D.S.D. Sept. 10, 2010) (J. Lange) (holding that the whistleblower provision did not alter the employee's at-will employment status because the employee handbook containing the whistleblower provision was explicit in preserving the at-will relationship).

In the present case, the Court concludes that there is nothing in Lowes's Employment Handbook or No Harassment Policy evincing an intent to create any contractual rights. While the

Handbook clearly demonstrates intent by Lowe's to adhere to anti-discrimination laws,[4] the Handbook specifically states that it is not to be considered a contract. Accordingly, Lowes's Motion for Summary Judgment on Mader's breach of contract claim is granted.

## II. Intentional Infliction of Emotional Distress

In order to establish a claim of intentional infliction of emotional distress ("IIED") under South Dakota law, a plaintiff must show: (1) extreme and outrageous conduct by the defendant; (2) intent on the part of the defendant to cause plaintiff severe emotional distress; (3) that the defendant's conduct was the cause in-fact of plaintiff's injuries; and (4) that the plaintiff suffered an extreme disabling emotional response to defendant's conduct. *Petersen v. Sioux Valley Hosp. Ass'n*, 486 N.W.2d 516, 518 (S.D. 1992), *reh'g granted*, 491 N.W.2d 467 (S.D. 1992). Under South Dakota law, "the tort of intentional infliction of emotional distress imposes liability on the defendant for intentional *and* reckless conduct resulting in emotional distress." *Petersen v. Sioux Valley Hosp. Ass'n*, 491 N.W.2d 467, 468 (S.D. 1992). A defendant may be liable for IIED under a recklessness theory where his or her conduct constitutes a deliberate disregard of a high probability that the emotional distress will follow." *Id.*

"The conduct necessary to form [IIED] must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and be regarded as atrocious and utterly intolerable in a civilized community." *Harris v. Jefferson Partners, L.P.*, 653 N.W.2d 496, 500 (S.D. 2002). The question of whether the defendant's conduct was extreme and outrageous is initially for the trial court. *Id.* "When reasonable minds differ, it is for the jury to determine whether the conduct has been sufficient extreme and outrageous to result in liability." *Kjerstad v. Ravellette Publ'ns, Inc.*, 517 N.W.2d 419, 429 (S.D. 1994).

The Court does not find that Mader has presented sufficient evidence to allow a reasonable trier of fact to conclude that she suffered severe emotional distress resulting from the defendant's conduct. "Although physical symptoms are not required to prove severe emotional distress in South Dakota, the plaintiff must provide some type of evidence adequate to prove that severe emotional distress does, in fact, exist." *See Christians v. Christians*, 637 N.W.2d 377, 389 (S.D.

---

[4] Lowes's No Harassment Policy states that "[t]he purpose of the No Harassment policy is to outline the Company's commitment to building and preserving a community in which all of its members can work together, free of discrimination and harassment of any kind."

15

2001) (J. Amundson, concurring in part and dissenting in part) (citing *Stene v. State Farm Mut. Auto. Ins. Co.*, 583 N.W.2d 399, 404 (S.D. 1998) (indicating that a "manifestation of physical symptoms" is required for negligent infliction of emotional distress, but not for intentional infliction of emotional distress)); *see also, e.g., U.S. ex rel. Kappenman v. Compassionate Care Hospice of the Midwest, L.L.C.*, No. 09-4039, 2012 WL 602315, at *11 (D.S.D. Feb. 23, 2012) (J. Schreier) (quoting *Christians*, 647 N.W.2d at 389); *McLeod USA Publishing. Co.*, No. 03-4087, 2006 WL 978705 at *11 (D.S.D. Apr. 12, 2006) (J. Schrier) (finding sufficient evidence of severe emotional distress from the plaintiff's testimony that she was prescribed anti-depressants as a result of the stress she experienced from defendant's conduct and from her supervisor's testimony that plaintiff discussed killing herself after he fired her); *Wangen v. Knudson*, 428 N.W.2d 242, 248-49 (S.D. 1988) (finding sufficient evidence of severe emotional distress when two treating psychiatrists testified that plaintiff's depression has worsened after the incident and that he missed five weeks of work); *Bass v. Happy Rest, Inc.*, 507 N.W.2d 317, 323 n22 (S.D. 1993) (restating the trial court's finding that there was sufficient evidence in the doctor's report for a jury to find that she suffered depression and other symptomatic emotional distress).

In the present case, Mader testified in her deposition that she suffered from anger, sleeplessness, and nightmares. Mader Dep. 66:21-67:3. There is no evidence that Mader experienced any physical symptoms, missed work, or that she sought medical attention to help treat any alleged emotional distress. *See Rodriguez v. Siouxland Urology Ass., P.C.*, No. 09-4051, 2013 WL 684243, at *1 (D.S.D. Feb. 22, 2013) (J. Schrier). Overall, the Court finds that Mader's conditions are "no more than ordinary" and do not rise to the level necessary to sustain a claim of IIED. *See Anderson v. First Century Fed. Credit Union*, 738 N.W.2d 40, 51 (S.D. 2007) (stating that plaintiff's testimony regarding difficulty sleeping, irritability, and general feeling that he was not well were "no more than ordinary" and did not rise to the level necessary to sustain a claim of IIED). Moreover, Mader provided no evidence that Heidzig's conduct was the cause-in-fact of her alleged symptoms.

Because Mader has failed to provide evidence sufficient to establish a claim for IIED, the Court will grant summary judgment in favor of Lowe's on this claim. However, because Heidzig has not yet entered an appearance in this matter, the Court will not dismiss Mader's IIED claim as alleged against Heidzig in his individual capacity.

### III. Vicarious Liability

Mader alleges that Lowe's is liable for the acts committed by Heidzig constituting sexual harassment and intentional infliction of emotional distress under the law of vicarious liability. Compl. ¶ 100.

"Vicarious liability, also known as the doctrine of respondeat superior, provides that a principal or employer may be held responsible for 'the employee's or agent's wrongful acts committed within the scope of the employment or agency.'" *State v. Bosworth*, 899 N.W.2d 691, 701 (S.D. 2017) (quoting *Bernie v. Catholic Diocese of Sioux Falls*, 821 N.W.2d 232, 237 (S.D. 2012)).

The Court has already established that, in viewing the facts in the light most favorable to Mader, no reasonable juror could find that Lowe's failed to take prompt remedial action reasonably calculated to stop the harassment, nor that Heidzig's conduct constituted intentional infliction of emotional distress. Because the Court grants summary judgment and dismisses Mader's hostile work environment and intentional infliction of emotion distress claims, Lowe's may not be held vicariously liable for such conduct. *See Total Auctions & Real Estate, LLC v. S.D. Dept. of Revenue & Regulation*, 888 N.W.2d 577, 582 (S.D. 2016) (stating that respondeat superior is a means of imposing vicarious liability on an employer for an employee's torts committed within the scope of employment; it is not an independent tort claim against employer).

Even if Heidzig's conduct created a hostile work environment, Lowe's cannot be vicariously liable for Heidzig's alleged sexual harassment because Heidzig is a co-worker and not a supervisor of Mader. *See Engel v. Rapid Cty. Sch. Dist.*, 506 F.3d 1118, 1123 (8th Cir. 2007); *see also Vance v. Ball State Univ.*, 570 U.S. 421, 427-28 (2013) (stating that while an employer may be *directly* liable for a non-supervisory employee's unlawful harassment if the employer knew or should have known about the conduct and failed to take remedial action, an employer may be *vicariously* liable for the creation of a hostile work environment only by supervisory employees). Because Heidzig was not a supervisor, and not empowered by Lowe's "to take tangible employment actions against [Mader], *i.e.*, to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits,'" Lowes may not be vicariously liable for Heidzig's alleged conduct. *See Vance*, 570 U.S. at 431.

Additionally, the Court concludes that even if Mader has met all of the elements of a claim for intentional infliction of emotional distress, under South Dakota law, Heidzig's alleged conduct falls outside the scope of his employment. Accordingly, Lowe's may not be held vicariously liable for such a claim under South Dakota law.

In determining whether an intentional tort such is at issue in this case is within the scope of employment, the South Dakota Supreme Court uses a two-prong test: whether the purpose of the act was to serve the principal *and* whether the act was foreseeable. *Bernie*, 821 N.W.2d at 237. Under the first prong, a "principal may be liable for an agent's acts where the agent's 'purpose, however misguided, is wholly or in part to further the [principal's] business[.]'" *Id.* (quoting *Hass v. Wentzlaff*, 816 N.W.2d 96, 102-03 (S.D. 2012). "An act furthers the principal's business if it carries out the objectives of employment." *Id.*

> "[W]ithin the scope of employment" has been called vague but flexible, referring to "those acts which are so closely connected with what the servant is employed to do, and so fairly and reasonably incidental to it, that they may be regarded as methods, even though quite improper ones, of carrying out the objectives of the employment."

*Id.* (quoting *Kirlin*, 758 N.W.2d at 444) (citation omitted)). "But if [the agent] acts from purely personal motives . . . he is considered in the ordinary case to have departed from his employment and the [principal] is not liable." *Id.* (*quoting Hass*, 816 N.W.2d at 103).

> Therefore, it must first be determined whether the act was wholly motivated by the agent's personal interests. If the agent acted with intent to serve solely his own interest, the act is not within the scope of employment and the principal is not liable. Liability does, however, attach if "the act had a dual purpose that is, to serve the [principal] and to further personal interests."

*Bernie*, 821 N.W.2d at 238 (quoting *Hass*, 816 N.W.2d at 103).

There is no evidence that the alleged harassment by Heidzig was "closely connected" with what Heidzig was employed to do and "so fairly and reasonably incidental to it, that [it] may be regarded as methods, even though quite improper ones, of carrying out the objectives of employment." *See Bernie*, 821 N.W.2d at 237; *see also Vance*, 570 U.S. at 428 (stating that "sexual harassment [is] unlikely to fall within the scope of a servant's duties"); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 633, 755-57 (1998) (noting that the "general rule is that sexual harassment by a supervisor is not conduct within the scope of employment"); *Jaros*, No. 00-4007, at *6 (citing

*Ellerth*, 524 U.S. at 755-57); *Harvey v. Regional Health Network, Inc.*, 906 N.W.2d 382, 393-94 (S.D. 2018) (concluding that even though employer's policies required employees to report abuse of nursing home residents, employee's false reports of abuse fell outside scope of employment). *But see Hansen v. McLeod USA Pub. Co.*, No. 03-4087, 2006 WL 978705, at *9-*10 (D.S.D. Apr. 12, 2006) (J. Schrier) (finding harassment within scope of employment because it took place during working hours and was foreseeable because employee handbook addressed harassment)[5].

In addition, there is no evidence in the record to suggest that Heidzig's actions were reasonably foreseeable. *See Buus v. Stelzer*, No. 12-4173, 2015 WL 1464710 at *2-*3 (D.S.D. Mar. 30, 2015) (J. Piersol) (finding that a traffic accident was a reasonably foreseeable consequence when employer permitted employees to use its vehicles to get food after the last ration was provided at 4:00pm). Prior to Mader's complaint, there was no knowledge of Heidzig's alleged propensity to engage in inappropriate behavior. Heidzig had a good pre-employment background, and there had been no prior history or allegations raised against him for inappropriate conduct.

For the foregoing reasons, Lowe's cannot be held vicariously liable for Heidzig's actions.

Accordingly, IT IS ORDERED:

1) Lowes's Motion for Summary Judgment, Doc. 17, is granted in part and denied in part; Mader's claims against Lowe's for intentional infliction of emotional distress,

---

[5] Mader argues in her brief that even if Heidzig was acting outside his scope of employment, Lowe's may be vicariously liable for his conduct because Heidzig, as agent of Lowe's "was aided in accomplishing the tort by the existence of the agency relation." Mader Br. at 16 (citing Restatement (Second) of Agency § 219(2)(d)). The Supreme Court applied that concept to the Title VII context in *Ellerth* and *Faragher* and "identified two situations in which the aided-in-the-accomplishment rule warrants employer liability even in the absence of negligence, and both of these situations involve harassment by a "supervisor" as opposed to a co-worker." *Vance*, 570 U.S. at 428-29. First, the Court held that an employer is vicariously liable when a supervisor takes a tangible employment action. *Id.* at 429 (citing *Ellerth*, 524 U.S. at 762; *Faragher*, 524 U.S. at 790) The reasoning for this is that when a supervisor makes a tangible employment decision, there is assurance the injury could not have been inflicted absent the agency relation. *Id.* Second, *Ellerth* and *Faragher* held that, even when the supervisor's harassment does not culminate in a tangible employment action, the employer can be vicariously liable for the supervisor's creation of a hostile work environment if the employer is unable to show that it exercised reasonable care to prevent and promptly correct any harassing behavior and that the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities that were provided. *Id.* The Court noted that "a supervisor's power and authority invests his or her harassing conduct with a particular threatening character, and in this sense, a supervisor always is aided by the agency relation." *Id.* (citing *Ellerth*, 524 U.S. at 763; *Faragher* 524 U.S. at 803-05).

Here, it is undisputed that Heidzig was never in management at Lowe's, nor was he ever a supervisor of Mader's, or vested with the power to take tangible employment actions against her. Accordingly, Lowe's may not be vicariously liable for any of Heidzig's alleged conduct.

vicarious liability, and breach of contract are dismissed with prejudice and her hostile work environment claim remains for trial; and

2) Mader's claim against Heidzig in his individual capacity for intentional infliction of emotional distress also remains in this case.

Dated this 16th day of August, 2019.

BY THE COURT:

_____
Lawrence L. Piersol
United States District Judge

ATTEST:
MATTHEW W. THIELEN, CLERK
_____